PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. COSME QUINTANA, Defendant and Appellant.

No. 5859. Argued February 11, 1936.—Decided May 27, 1936.

R. *Martínez Nadal*, F. *Navarro Ortiz* and F. *González Fagundo* for appellant. R. *A. Gómez* and *Luis Janer*, *Prosecuting Attorneys*, for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

The prosecuting attorney for the District of Humacao filed an information against Cosme Quintana, charging him with the crime of murder in the first degree, committed as follows:

"The aforesaid Cosme Quintana on the 18th day of April, 1934, in the municipality of Juncos, within the judicial district of Humacao, P. R., unlawfully and wilfully, with malice aforethought, and with a deliberate and premeditated intent to cause death to the human being Eloy Juncos, fired several shots. from a revolver at him, with one of which he wounded him on the left side of the chest, as a result of which the aforesaid Eloy Juncos died then and there."

The defendant pleaded not guilty and asked for a trial by jury. The trial commenced on February 4, 1935, lasted through the 5th, and was finished on the 6th, when the jury rendered a verdict finding the defendant guilty of voluntary manslaughter.

On April 5, 1935, defendant filed a motion for a new trial, which was denied on May 9 following. He appealed. Judgment was at length entered on May 24, 1935, by which he was sentenced to 10 years in the penitentiary, at hard labor.

He also appealed from the judgment to this Court. Both appeals have been perfected and will be decided together.

In his brief appellant assigns three errors. The first two are to the effect that the court erred in overruling the motion for a new trial and in imposing upon the defendant a ten year sentence. It is contended in his third assignment that the verdict is contrary to the evidence.

Before we study the case, it will be convenient to make reference to the theories of the prosecuting attorney and of the defense, as the same were presented to the jury.

The former said:

"The prosecuting attorney will offer in evidence to the consideration of the gentlemen of the jury expert testimony, consisting in the testimony of Dr. Agustín Mújica, who assisted the wounded man Eloy Juncos in the Municipal Hospital in Juncos, and who, after Eloy Juncos died, practiced an autopsy, finding that death had been caused by an acute hemorrhage as a result of a revolver shot. Testimony of persons, who at the moment in which the events occurred, saw when the defendant fired at Eloy Juncos, who fell from the sidewalk to the ground, and material evidence consisting in the revolver taken from the possession of Cosme Quintana in the moments following the shots which he fired. The prosecuting attorney will seek to prove that on this 18th day of April, 1935, the deceased Eloy Juncos left the town of Caguas in the company of his relatives, going toward Juncos; that upon arriving in front of the town square of Juncos, the deceased got out of the car, taking his relatives toward the house of Francisco Franqui, where a daughter of the latter was living, Miss° Luz Virginia Franqui, the fiancée of Eloy Juncos, Mr. Juncos tarried a while in the town square, talking with several friends, among whom was the chief of police Mr. Torres and others. From there he went to the right, along Martínez Street, I think it is called, and as he was going along the street toward the highway which leads to Gurabo, about seven or eight meters before reaching the corner at which one turns to the left, he came face to face with the defendant Cosme Quintana, who stopped him, and at that instant took a Smith & Wesson revolver out, put it against his left side, and fired a shot at close range, and when Eloy Juncos fell from the sidewalk to the street, he shot at him a second time, at which juncture the policeman Ayala came up and took part, arresting Cosme

Quintana and taking him to the police station. We shall also prove that the defendant Cosme Quintana, during the morning and during the afternoon of that day, had been looking for Eloy Juncos at the house of Francisco Franqui. The last of these visits was about five or five thirty, when he asked Rosa Franqui, mother-in-law of the defendant Cosme Quintana and aunt of Virginia Franqui, the fiancée, of Eloy Juncos, where Eloy Juncos was, to which she answered that he did not live in that house. The defendant left there, and about an hour or an hour and a half after these inquiries, he did in fact find Eloy Juncos, and fired two shots at him, one of which caused his death.''

When the prosecution had introduced its evidence and before introducing its own, the defense, by counsel, made the following statement:

''Your Honor and gentlemen of the jury, our theory is the same as that in the earlier trial. Our theory is that Eloy Juncos was in a difficult financial position, up to the point of his having been ejected from a business which he had; that he was a person accostumed to the use of firearms, for which he had already been once accused; that in spite of the fact that he was about thirty five years old, he had cast his eyes upon the charms of a child of sixteen, Luz Virginia Franquis, daughter of Francisco Franquis, a man esteemed and respected in the town of Juncos, having this child, his only child, and consequently the heiress of his properties. That at the beginning Mr. Franquis had objected to this courtship, something which angered Mr. Juncos intensely; that as it often happens in such cases, the child fell in love with Mr. Juncos, and that later Mr. Franquis on account of the insistence of certain friends agreed no longer to oppose him; that Mr. Juncos was in a great hurry to be married. Mr. Franquis had been seriously ill at that time and had had to be confined in the Auxilio Mutuo, and that while Mr. Franquis was in the Auxilio Mutuo, Mr. Eloy Juncos, seeking to hasten the marriage, dared the daughter to marry him over the opposition of her father, had some words with her in the city of Caguas, when he fired a shot for the purpose of intimidating her, causing a slight wound on Miss Virginia Franquis' leg; that when the father, ill in the Auxilio Mutuo, became aware of that, he ordered that Mr. Juncos be denied access to his home, until he should be well and should return to his home to take such action as might be proper; that this order enraged Mr. Juncos, and attributing the same possibly

to the intervention of the defendant Cosme Quintana, he made several threats of death which were carried to Mr. Cosme Quintana, who knew that he had in Mr. Eloy Juncos a mortal enemy, ready according to his own words, to take his life. That on the day in question, Mr. Juncos came from Caguas to Juncos with the intention of finishing up the business of the marriage and to marry Miss. Luz Virginia Franqui in any event, an intention which he announced in a loud voice in one of the streets of Juncos, stating that he had come to put an end to the matter, that he had to decide whether that night he would have to kill or be killed. That some moments after these last words of Mr. Juncos, they met at the place to which the witnesses for the People refer, on Martínez Street where it crosses Muñoz Rivera. Mr. Cosme Quintana was going along the sidewalk as though to take the street to his house, and Mr. Eloy Juncos was coming from the town square on the other sidewalk, when, on seeing Mr. Cosme Quintana, he crossed the street and went on to the sidewalk where Cosme Quintana was walking. There was a brief discussion impassioned and brief on the part of Mr. Juncos, during which Mr. Eloy Juncos struck Mr. Cosme Quintana and at once put his hand to the pocket of his trousers to draw a weapon to use the same; that at that moment Cosme Quintana made use of a revolver which he was carrying, in his turn drew it and immediately shot. Upon receiving the shot from Cosme Quintana, Eloy Juncos fell from the sidewalk to the street, his legs buckled under him and he fell.''

The first assignment of error, that in which it is contended that the court erred in refusing to grant a new trial, is subdivided into twelve parts.

■■ The first four subdivisions bear upon the testimony of the witness Rosa Franquis. It is contended that the court erred in permitting the prosecuting attorney to question her upon her relationship to Francisco Franquis, in permitting him to ask her the following questions: ''How long was he (Eloy Juncos) courting Miss Luz Virginia Franquis?'' and ''In visits which he made to her at your house, do you remember whether on any occasion you spoke with Cosme Quintana about Eloy Juncos?'' and in refusing to strike the whole testimony.

The defense objected to the questions about relationship and to the others which we have transcribed, believing them

immaterial and impertinent. With respect to the motion to strike, the record shows the following:

"Mr. Martínez Nadal.—I am going to ask that the whole testimony of the witness be stricken, and particularly that part which tends to show a conversation with Cosme Quintana. This witness, Your Honor remembers very well, has been asked about conversations with Cosme Quintana, etc. But I am going to make an exception, I ask the whole of the testimony of the witness be stricken except that part which refers to the point that Cosme Quintana at midday asked her for Eloy Juncos. That is the only part which I believe ought to remain in the record of this conversation; as to the fact that he came in in the morning and talked with his wife and that he was angry, she has made no mention of what they talked about of why he was angry, and later in the afternoon she says that Cosme Quintana came alone, entered the reception room and the only thing which she heard him say was 'from man to man,' but without' making threats or anything against Eloy Juncos, but simply those words; consequently, Your Honor, how is that going to stay in the record? I admit that that which I said before ought to remain in the record, but the rest shows no connection of any kind with Mr. Juncos; therefore, we ask that the whole of the testimony of the witness be stricken except those words which Cosme Quintana used when he asked for Eloy.

"The Prosecut'ng Attorney.—The whole of the testimony of the witness should remain in the record because it is now perfectly connected and complemented by the testimony of Mrs. Juncos de García and Eduardo F. Torres, for the reason that he was asking for Eloy Juncos at that hour of the afternoon is now shown and what happened later was a consequence, the bloody event in which Eloy Juncos lost his life . . .

"The Court.—The Court is of the opinion that everything bearing upon Cosme Quintana should be stricken, except the phrase used by Cosme Quintana in the morning when he said: 'from man to man,' and the inquiry by Cosme Quintana for Eloy Juncos in the house of the witness, in spite of the fact that it was said that he was speaking in a loud voice, etc. In this sense, I overrul the motion to strike, that is, except in so far as the words of Cosme Quintana, 'from man to man' and the inquiry which Cosme made for Eloy are concerned.

"Mr. Martínez Nadal.—We note an exception to the order of the court for failing to strike the words 'from man to man,' and con-

sequently, resting upon our motion, we do not wish to question the witness.''

If an examination of the testimony of the witness is made in the light of the information and the theory of the case set forth by the prosecuting attorney, one must conclude that the testimony of Rosa Franquis was not immaterial, and that the phrase 'from man to man' could and ought to have remained in the record. The testimony tended to show antecedent circumstances explaining the premeditated nature of the defendant's act. There was no error, and if there had been, it would not have been prejudicial, since the verdict was not a verdict of murder, but of manslaughter.

■■■ The four following subdivisions bear upon the testimony of Juanita Juncos de García. It is contended that the district court erred in permitting the following questions to be put to the witness: ''When you went to the hospital and saw Eloy Juncos dead as you have said, did you see his clothes?'' and ''Did that coat have any particular mark that you recall?''; in admitting in evidence the suit which Eloy Juncos wore on the night in question, and in refusing to strike the whole of the testimony of the witness.

The position taken by the defense is and was based upon the contention that, the fact of Eloy Juncos' death having already been proved as a result of a bullet wound, the evidence was unnecessary and was presented for the sole purpose of unduly influencing the jury against the defendant. From the case of *McKay* v. *State,* decided by the Supreme Court of Nebraska and reported in American Annotated Cases 1913-B, 1934, p. 1039 (135 N. W. 1024, 39 L. R. A. (N. S.) 714), the following extract was cited:

''As the case will have to be tried again, we will refrain from expressing any opinion as to the weight of the evidence, and will only consider one of the errors complained of in connection therewith. It is urged that the court erred in admitting in evidence exhibits 6, 7, 18, 19 and 22. Exhibits 6 and 7 were two shirts, stained with blood, 18 was the coat, 19 the vest, and 22 the cap of the deceased. The testimony of the coroner, who was also a practicing physician

and surgeon, showed conclusively that the deceased had received three blows on the side of his head, each of which fractured his skull, and two of which penetrated the brain, either of which the doctor said was sufficient to have proved fatal. It was thus clearly established that the deceased had been murdered. There was no room for contention that his injuries had been self-inflicted, and the only question before the jury was: Did the defendant commit the murder? The admission of these blood stained garments and the flaunting of them before the jury could in no manner identify, or even tend to identify, the prisoner at the bar as the murderer. We can conceive of no other purpose which these exhibits could subserve than to excite the passions and inflame the minds of the jury. A defendant who is being tried for any offense, and particularly one involving the possible taking of his life, is entitled to a trial upon competent evidence, evidence which tends to show his guilt or innocence, and not upon evidence which has no tendency in that direction, but which can only serve the purpose of distracting the minds of the jury from the real issue to gruesome exhibits which may easily lead them to a wrong conclusion.''

The principles upon which the Supreme Court of Nebraska goes are sound. The judgment before it ought to have been reversed on other grounds which appear from its opinion, and having set those out, the court added the paragraph above copied to serve as a guide for the court below in further proceedings.

Here the situation is different, since it does not appear from the record that the intention of the prosecuting attorney in introducing the evidence was that of unduly influencing the jury.

''The clothing of the victim of a homicide,'' says Underhill, Criminal Evidence, 2nd. ed. p. 59, sec. 48, ''if properly identified, may be exhibited, on the principle that it is a part of the res gestae, to illustrate to the jury the character and nature of the wounds, the motive of the crime, the manner and means of death, or to show how near the accused was to him, when he was slain.''

The prosecuting attorney followed that rule. He did not offer all the bloodstained clothing worn by the deceased. He

offered only the coat pierced by the bullet in the place where it caught fire, showing a shot fired at close quarters, to complement and explain the testimony of the witnesses with respect to the differing intensity of the two shots which they heard.

The court did not, therefore, err in admitting the evidence, or in overruling the motion to strike the whole of the testimony of the witness, sister of the deceased. Her testimony served to show to the jury what Juncos did on the 18th of April, 1934, from the time he left Caguas in her company until the moment before he received the wounds, and the defense may not contend that the testimony of the witness was improper, when the defense itself, in expounding its theory of the case to the jury, stated that the purpose of Juncos' trip was to finish up his marriage to Luz Virginia Franquis.

■ In the ninth and tenth subdivisions it is contended that the court erred in overruling the objection of the defense to the examination which was being made of the witness Luis Ortiz, as to whether Juncos' coat was smoking and whether the witness knew it, and in permitting the witness Arturo Meaux to be asked whether he saw the coat of the deceased glowing.

Luis Ortiz was a policeman who picked up Juncos after he was wounded. The prosecuting attorney asked him "Where was it that you looked to see if there were any firearms?" And the witness answered: "In the place where the wounded man was, and then he turned around and on this side here, on the left, since the coat he had on was smoking . . ." The defense made no objection. The objection came when the prosecuting attorney insisted.

Arturo Meaux heard the shots and saw the two men. He hid himself and upon coming out of his hiding place he saw the policeman Ayala with one of the men, who had a revolver in his hand. He drew near to the other who was on the

ground, moved him and found out that he was still alive and "he noted that the left side of his coat was smoldering."

A mere statement of what happened is sufficient to show that there was no error. Both witnesses testified as to facts which they saw, which they directly apprehended and which are closely related to the act which the defendant had just committed as a result of which the prosecuting attorney accused him of an offense of murder.

■ In the eleventh subdivision it is contended that the court erred in not permitting the witness Manuel Jiménez to testify as to the reputation of the deceased, and to show specific acts committed by him.

The discussion giving rise to this assignment occupies several pages of the record. It was finally decided as follows:

"The Court. The question is as follows: the court does not have the least doubt that the specific acts of the defendant, I mean, the deceased, which show that the deceased had a violent and aggressive nature, are adm'ssible in evidence when there is a plea of self-defense, provided it is shown as a cond'tion precedent that such acts were known by the defendant at the time he exercised his right of self-defense; and that up to this time has not here been shown, with respect to the specific act now sought to be shown.

"Counsel for Defendant. But a witness testified here before this Court that the threats which Eloy Juncos made about Cosme Quintana, this witness carried to Cosme Quintana.

"The Court. The objection is granted, although testimony upon these points would be admissible after the legal requirements before mentioned are complied with."

There was no error. *People* v. *Rivera*, 49 P.R.R.

■ The twelfth subidvision, which is the last, bears upon the admission in evidence of the stockings which Luz Virginia Franquis was wearing when, according to the evidence of the defendant, her fiancé, the deceased, shot at her in Caguas, wounding her in a leg, in order to prevent her from attending a certain performance to be held in San Juan,

in the Ateneo. The witness Rosa Franquis, grandmother of Virginia, called on rebuttal, identified the stockings. The defense put a series of questions to her on cross-examination and objected to the admission of the stockings for the reason that the witness had said that they were brown in color, while those presented were not.

Upon being put to test by counsel for the defendant as to the color of his tie, the witness in fact showed that she might have been mistaken, and perhaps the court should not have admitted the stockings in evidence. Nevertheless, if there was error, it was not in our opinion prejudicial. The incident of the shot tending to show the violent nature of the deceased, was before the jury with a wealth of detail. The admission of the stockings, untorn, was for the purpose of showing that there was no wound in the leg, but not that the shot was not fired, which was fired really for the purpose of terrifying the fiancée and to prevent her, as it did, from going to the party. Whether or not the fiancée received a wound was not of decisive importance.

From an analysis of all of the subdivisions of the first assignment, we are convinced that the court was justified in refusing a new trial, a conviction which is strengthened from a study of the whole case.

Let us now see whether the verdict is contrary to the evidence, and whether the sentence imposed is excessive, as appellant maintains.

Defendant admits that he caused the death, but contends that he acted in legitimate self-defense.

His witness Gregorio Montañez stated that he heard Eloy Juncos say in Caguas with reference to the defendant: "This person is the one to blame for what is happening to me, and I have got to have it out with him," at that moment taking out a revolver, and stating in answer to the advice of Montañez that he had decided that "the world is for the brave," which threats the witness carried to the defendant.

Francisco Franquis testified with respect to the commission which he gave the defendant to put an end to the courtship of his daughter by the deceased, and the witnesses Mariano Villaronga, Vieta de Miranda, Engracia Ramos, Ramiro Vázquez and Fernando Hernández make reference to the incident of the shot fired in Caguas by the deceased at his fiancée to prevent her from going to a certain party in San Juan. Manuel Giménez states that he ejected Eloy Juncos for failure to pay rent, and that Juncos had told him that he was thinking about marrying Franquis' daughter.

Juan Corsino stated that he was commissioned by Franquis to take Luz Virginia out of school and to advise the owner of the house in which she was living in Caguas to stop Juncos' visits to his daughter. Arturo Meaux a witness for the defendant said that Juncos came to him once in a very nervous condition and told him that the defendant had thrown him out of his fiancée's house, and asked him for a revolver to square accounts with the defendant, from which he refrained upon advice of the witness. Dr. Barreras testified that the defendant "is a man who talks to no one, very close-mouthed, I have never known him to have any dispute or question with any neighbor . . . he is morally spotless, a good father and good husband." José Rubio stated that on the night of the occurrence he heard some one from a car say to Juncos, "Eloy, come on let's go to Caguas," to which he replied, "no, I have come with a sister of mine, and I have come to settle a problem, and I will settle it, or kill or be killed."

So much for the setting. As eye witnesses, the defense offered Tiburcio Castro and Miguel Delgado.

The former testified: "I saw Mr. Eloy Juncos when he was walking down the middle of the street, and upon seeing Cosme Quintana, he turned and went up on the sidewalk and they went on talking. Eloy Juncos slapped him with his left hand and at once put his hand behind and took out something, I can not say precisely what it was that he took out."

In answer to the question "And what did Cosme Quintana do?" he answered: "I didn't see, I heard two shots, I did not see what he did, I heard the two shots."

Delgado testified: "I saw Mr. Eloy Juncos when he was coming from the town square . . . he came close to see him (Quintana), turned, and stood there as though talking .·. . Juncos slapped him and took something from his back pocket, and when that happened there were two shots . . . Juncos fell to the ground."

We already know something of the evidence offered by the People with respect to the events before the shots. It will be sufficient to add that Rosa Franquis testified that a short time before the event, the defendant was in her house asking for Eloy Juncos.

The prosecuting attorney did not in fact present any eye witness, but the defendant himself, just after the occurrence, stated to the chief of police that he had some words with Juncos and shot him, without making any reference whatever to an attack by Juncos.

Several persons, among them two policemen, heard the shots. Arturo Meaux said: "I heard a shot, and stopped and looked back and saw two men, then I heard another shot, went up and saw the policeman Ayala running and drawing near both men and seizing one who had a revolver in his hand. I came up to the one who was on the ground, he was face down and I turned him over and he was moving his leg about and I knew that he was alive. By myself I could not carry him and I called out and someone helped me to take him to the hospital. I saw on the coat of the wounded man something glowing."

Another policeman, Ortiz, who like Ayala, heard the shots, ran up to the scene of events. He looked to see if there were any firearms and found none. Only the revolver which the defendant had in his hand was seized.

Doctor Mujica, who examined the deceased, found a bullet wound in his body, which entered in the sixth intercostal

space, and which affected the left lung, the descending aorta, the lower venous cavity, the stomach, the right side of the diaphragm, the bullet being lodged at the base of the right lung. The doctor found another wound in the lower part of the left arm. Death was due to an internal hemorrhage caused by the former wound, there being at the place where the bullet entered a large amount of powder and burns on the skin in the form of tattooing, which must have been caused by reason of the firearm being almost touching the body.

The jury was not obliged to believe—and its verdict indicates that it did not believe—the witnesses for the defense who testified that when the two men met, Juncos attacked Quintana. It believed the evidence of the prosecuting attorney which tended to show rather the commission of a murder than that of manslaughter, but in the absence of eye witnesses, it preferred to sway the balance of its opinion in favor of the defendant, and found him guilty of manslaughter.

The defendant himself said nothing about battery in the first few minutes. The mortal wound speaks for itself, and the coat which covered the body of the victim with a smoldering ring around the perforation through which the mortal wound was inflicted, was smoking, showing how close was the arm of the killer. It was all very rapid. Neither upon the fallen man, nor upon the scene of events was any weapon whatever found. Notwithstanding the quarrelsome nature and the constant use of firearms attributed to the deceased and the fact that according to the testimony of one witness for the defense he was ready to kill or be killed that day, it is a fact that at the critical moment he was unarmed. As to the motive, it is impossible to leave out of consideration the fact that in the fight for the hand of Luz Virginia Franquis, Juncos was triumphant. The defeat was felt in the opposition camp to which the defendant belonged.

Under these circumstances it is impossible to hold that the verdict is contrary to the evidence, or that the court

74

erred in exercising its discretion in imposing upon the defendant the maximum sentence permitted by the law.

Consequently, since the court below committed neither the second nor the third error assigned, the appeals must be dismissed and the order and judgment appealed from affirmed.

Mr. Justice Wolf concurs in the result.

Mr. Justice Córdova Dávila and Mr. Justice Travieso took no part in the decision of this case.